UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK

_____

STEPHEN H. MCFALL,

                              Plaintiff                    DECISION AND ORDER

-vs-
                                                          15-CV-6176 CJS

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                              Defendant.

_____


APPEARANCES

For the Plaintiff:          Mark M. McDonald, Esq.
                            Bond and McDonald
                            91 Genesee Street
                            Geneva, New York 14456

For the Defendant:          David L. Brown, Esq.
                            Social Security Administration
                            Office of General Counsel
                            26 Federal Plaza, Room 3904
                            New York, New York 10278

                            Kathryn L. Smith, A.U.S.A.
                            Office of the United States Attorney
                            for the Western District of New York
                            100 State Street
                            Rochester, New York 14614


INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Stephen McFall ("McFall" or "Plaintiff") for Social Security

1

Disability Insurance ("SSDI") benefits[1] and Supplemental Security Income ("SSI")

benefits.  Now before the Court is Plaintiff's motion (Docket No. [#10]) for judgment on

the pleadings and Defendant's cross-motion [#12] for judgment on the pleadings.

Plaintiff's application is granted, Defendant's application is denied, and this matter is

remanded for further administrative proceedings.

BACKGROUND

The reader is presumed to be familiar with the Parties' submissions, which contain

detailed recitations of the pertinent facts.  The Court has reviewed the entire

administrative record and will offer only a brief summary of the facts contained therein.[2]

McFall claims to be disabled primarily due to mental/emotional impairments, not

physical impairments.  McFall was classified as learning disabled while in school, and

dropped out of high school after completing the ninth grade. (T33).  McFall has average

intelligence, but struggled in his academic subjects.  When McFall was fourteen, his

teachers reported that he exhibited "limited attention and concentration," (T261),

although they also indicated that he was able to understand and follow both simple and

complex directions. (T270, T285).  However, according to McFall, he quit school because

he "hit [a] teacher." (T393); *see also*, (398) ("[He claims to have had] a relatively high

---

[1]With regard to SSDI benefits, the issue before the Commissioner is whether McFall was disabled at any time between January 1, 1999 and June 30, 2008. (T12) (Unless otherwise indicated, citations are to the administrative record.)

[2] *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999) ("To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.") (citation omitted). Of course, in discussing the entire record, the Court "keep[s] in mind that it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998).

2

degree of oppositional and defiant acts directed toward teachers and other school authorities.  He stated that he . . . left school as an alternative to a self-perceived threat of expulsion."); (T408) ("[H]ad to leave school due to his anger.").

At the time of the hearing, McFall was thirty-seven years of age, and had tried a variety of different jobs.  McFall worked at various laborer-type positions, and even claimed to have had his own construction company at one point. (T314).  However, it appears that McFall never remained at any particular job more than a few months, and in some cases he quit after working only one day. (T203).  McFall has indicated on several occasions that he does not remain employed because he has a temper and does not like people telling him what to do. (222) ("I don't like people telling me what to do[.]"); *see also*, (T243) ("He does not like to work under anyone."); (T235) ("He does not like to take orders from others.").

McFall is financially supported by his parents and/or a girlfriend or wife.  For example, at the hearing McFall indicated that his current wife was paying his entire child support obligation on a child from a prior relationship,[3] and that he is driving a "spare" pickup truck loaned to him by his father. (T39-41).  Indeed, McFalls's parents have submitted affidavits indicating that they cannot continue to support him financially. (T235, 240).

McFall has four children resulting from long-term relationships with two different women.  These relationships have been volatile, and McFall has been arrested and jailed on several occasions, either for violating orders of protection or for failing to pay child

---

[3]As of the date of the hearing McFall owed $5,000.00 in child support.

support.

McFall has received mental health counseling over a period of years from the John D. Kelly Behavioral Health Center ("Kelly Behavioral"), for issues such as depression, anxiety, anger and irritability.  McFall typically sought such counseling immediately following domestic disputes with his girlfriend/wife/children/step-child, and he usually stopped attending counseling once those relationship problems subsided temporarily. (T302, 306,[4] 308, 309,[5] 312,[6] 395, 398, 404, 406, 407, 410, 411, 413,[7] 414[8]).

McFall's treatment providers at Kelly Behavioral have offered the following diagnoses: Anxiety NOS (not otherwise specified), impulse control disorder, depression, intermittent explosive disorder, mood disorder NOS, alcohol abuse, borderline personality disorder, personality disorder NOS with borderline, avoidant and narcissistic features, and major depressive disorder, recurrent.

McFall's therapists generally attribute his problematic behavior to his upbringing and personality, as opposed to any neurobiological dysfunction. (T304) ("Much of Steve's issues can be attributed to personality factors yet there is a mood component to him that appears to require periodic treatment.  His family of origin was [dysfunctional in certain

---

[4]"The patient describes a pattern of intense interpersonal relationships with significant other which is often a major source of stress for him."

[5]"[P]atient is noted with a pattern of intense interpersonal relationships, frantic efforts to avoid abandonment[.]"

[6]"Relationships continued to be the primary source of Steve's problems resulting in mood changes."

[7]"His pattern of attending  a few visits and then suddenly dropping out continued during this admission."

[8]"[T]his cycle is suggestive of personality dysfunction as opposed to a true Axis I depressive or anxiety problem.""

respects].”); (T410) (“It was felt Steve’s psychiatric problems were more related to personality issues/poor coping strategies than a neurobiological dysfunction.”); (T414) (““[T]his cycle is suggestive of personality dysfunction as opposed to a true Axis I depressive or anxiety problem.”).

McFall’s most extensive psychological assessment was  performed on November 17, 2004, by Drew J. Arnold, Ph.D. (“Arnold”), at Kelly Behavioral. (T397-403).  At the time of the assessment, McFall told Arnold that he was currently “self employed as a contractor,” though his work was “somewhat inconsistent.” (T397).  Arnold noted that McFall had

> a history of significant mental health difficulties.  Available records do contain diagnoses, which include Anxiety Disorder-NOS, Depressive Disorder-NOS as well as Impulse Control Disorder.  These records have also questioned the appropriateness of a diagnosis of Attention Deficit Hyperactivity Disorder.

(T398).  Arnold administered a variety of tests to McFall, and observed, with regard to such testing, that “[w]hen approaching items that assessed his cognitive functioning and abilities, Mr. McFall demonstrated an adequate ability to establish focused attention, but [had] some difficulty with maintaining focused attention with consistency,” and was “mildly distractible.” (T399).

Arnold’s assessment, based on his examination of McFall and the testing results, included the following opinions:

> McFall does have a mild, cognitively based deficit in his ability to inhibit responses.  . . .  [H]is problem solving skills are somewhat below average, [although] specific subtle deficits in problem solving alone would not be significantly limiting in his adaptive functioning.  . . .  McFall’s code type was consistent with those individuals who are somewhat immature and

narcissistic. . . . While his overall responses were not fully consistent with the diagnosis of depression, subanalysis did indicate that he had clinically significant difficulty with dysphoria[9] and lack of drive. . . . Most notably, Mr. McFall did have significant elevation on all of the indicators that suggested that he experienced marked social discomfort. . . . His most predominant personality characteristics were in the avoidant and antisocial domains. . . . [T]he results [were not] consistent with those individuals who have significant depression. The results did suggest that he does tend to perceive alienation in interpersonal events. He would not be expected to have an overly simplistic analysis of social situations and would have basic ability to analyze problems. Interestingly, however, his responses did suggest that he had somewhat impaired ability to form and direct his responses and that he would become relatively easily emotionally overloaded and experience more demands for response than he is able to prepare and implement. This would tend to suggest that his emotional responses would flood or overwhelm his basic problem solving skills.

(T399-402).

Several times when McFall sought treatment for feeling anxious, depressed or angry, he indicated that he has poor memory and concentration. *See, e.g.*, (T48) (Patient says his memory is "lousy"); (T48) ("I'm not very good at focusing or concentrating.").[10] Indeed, at times McFall has attributed his difficulty keeping a job to this alleged inability to concentrate. *See, e.g.*, (187) ("The claimant states that . . . he is unable to concentrate on his work, unable to meet employers' expectations and often gets angry and quits."); (T195) (Claimant stated that he stopped working because he "can't concentrate on things."). McFall has also claimed that his concentration is so poor that he cannot watch

---

[9] "A state of feeling unwell or unhappy." Merriam Webster Medical Dictionary.

[10] Similarly, in connection with his application for disability benefits McFall has indicated that he has a poor memory. (T48) ("The claimant . . . states that his memory is very poor."); (T182) ("The claimant states that his memory is very poor[.]").

television.[11]  However, on a different occasion McFall stated that he watches television "every day" (T218-219) (Watches television with his family every day), and on January 9, 2008, he reportedly told Michael Hasserberger, RN NPP ("Hasselberger"), that his concentration was "good." (T306) ("He describes his concentration as 'good.'").

McFall's treatment providers indicate that while he often presented as distressed, sad or anxious concerning a particular life event (usually domestic and/or legal problems involving a significant other), his mental status examinations were generally good or adequate,[12] including with regard to concentration and memory. (T408) ("Attention: good"); (T303) (Memory, attention, concentration "adequate"); (T313) (Memory "adequate."); (T316) (memory and cognitive functioning  intact); (T321) (concentration "fair"); (T326) (memory intact, normal mental status exam); (T420) (normal mental status exam); (T319) (concentration "good"). [13]

The Social Security Administration ("SSA") employee who interviewed McFall at the time of his application indicated that McFall appeared to have no difficulty reading, understanding,[14] or concentrating. (T192).  In that regard, the SSA employee noted: "The

---

[11] (T48) ("Q. Can you concentrate well enough to follow a movie on T.V.?  A. Not at all.  I can't sit through a whole movie.").

[12] An exception is a mental status exam performed on April 28, 2010, by a therapist whose signature is illegible. (T412).  The therapist indicated : "Stressed, poor sleep, irritable, poor appetite, increased feelings of being overwhelmed as well as hopeless, rapid mood swings, racing thoughts, isolating, and increased use of alcohol, indecisive and lacks deep insight.  . . . Lack of motivation or interest in anything." *Id*.  Despite the fact that this is probably the most negative mental status examination report in the record, the therapist assigned McFall a GAF score of 65. *Id*.

[13] On December 1, 2011, Marianne Miles, Ph.D. ("Miles") conducted a mental status examination and concluded that McFall's concentration appeared "good." (T319).  Nevertheless, because McFall claimed that he was having difficulty with concentration and focus, Miles increased his prescription of Lamictal. (T318-319).

[14] At the hearing, McFall told the ALJ that he can read, but doesn't understand what he is reading unless he reads it several times. (T46).

7

claimant *said* he has trouble understanding things sometimes but he seemed like he

responded well to questions, he asked appropriate follow up questions[.] . . . [H]e *says*

he has a poor memory for dates, [but] when going through the information sequentially,

he was able to recall more information." (T192) (emphasis added).

McFall's treatment providers at Kelly Behavioral frequently assigned him Global

Assessment of Functioning ("GAF") scores.  Between the years 2003 and 2012, those

GAF scores ranged between 50 and 80.  As noted earlier, McFall typically sought

treatment at times of upheaval in his personal life, when his GAF score would be lowest,

after which his GAF score would typically improve. *See, e.g.*, (394) ("GAF past year 60

current 50"); (406) ("GAF: Admission: 50  Last Session/Discharge: 65); (409) ("GAF Past

year 65  Current 60"); (310) (GAF 80); (313) ("GAF: 69"); (410) ("GAF:  Admission: 60

Discharge/Last Session: 71"); (311) ("GAF past year 71  current 65"); (304) (GAF past

year 71, current 50); (317) (GAF "75-80").  Such GAF scores were apparently made

based primarily on McFall's subjective complaints, since his mental status examinations

were generally consistent, regardless of the GAF score that was given.  *See, e.g.*, (393-

394) (GAF score of 50 given, where McFall claimed to be "anxious and depressed," even

though mental status examination was essentially normal); *see also*, (405) (GAF of 65,

even though mental status examination results were unremarkable).

None of McFall's treatment providers have indicated that he is permanently unable

to work.  Instead, on November 28, 2011, McFall's therapist at Kelly Behavioral, Robert

Dinan, MSW LCSW ("Dinan"), completed a report which, at most, suggests that McFall

was temporarily unable to work, though it does not expressly state that. (T439-440).

Dinan wrote this report shortly after McFall had returned to treatment, after his girlfriend

allegedly attempted suicide, and then ended their relationship. (T314, 316).  At that time, McFall reportedly told Dinan that he thought he might be "bipolar" and was considering applying for SSDI. (314) ("He further describes an inability to sustain employment, and thoughts that he is 'bipolar' and may should try for SSD.").  However, Dinan declined to make such a diagnosis, and instead reported that McFall had no limitations as to understanding and remembering instructions, carrying out instructions, making simple decisions, interacting appropriately with others, and maintaining basic standards of hygiene. (T440).  Dinan stated, though, that McFall would be "moderately" limited with regard to maintaining socially acceptable behavior without exhibiting behavioral extremes." (T440).  When asked to indicate whether McFall had any limitations as to "maintaining attention and concentration" and "functioning in a workplace at a consistent pace," Dinan wrote, "?."  When asked to provide a narrative statement concerning any work-related limitations, Dinan wrote: "Concentration + sleep have been impaired d/t [due to] mood +relationship fluctuations/instability." (T440).  Dinan indicated that such effects were expected to last only "1-3 months." (T440).  At the point in time that Dinan wrote that report, he had been treating McFall for more than six years. (406, 439-440).

In addition to the treatment that McFall received at Kelly Behavioral, he also received treatment from his primary care provider, Arthur Equinozzi, M.D. ("Equinozzi"), for diabetes, which is under control. *See, e.g.*, (T323-327, T43).  The results of Equinozzi's mental status examinations were unremarkable.  For example, Equinozzi observed that McFall's memory was "intact," that he had appropriate mood and affect, and that he had normal insights and judgment. (T326).

On May 1, 2012, in connection with McFall's application for disability benefits,

9

Christine Ransom, Ph.D. ("Ransom"), performed a one-time consultative psychiatric

exam at the Commissioner's request. (T340-343).  McFall told Ransom that for years, he

had been getting treatment from Kelly Behavioral for bipolar disorder, as well as anxiety.

(T340).  However, none of McFall's treatment providers ever diagnosed him with bipolar

disorder.[15]  McFall also told Ransom that he had stopped attending therapy at Kelly

Behavioral two months earlier (February or March, 2012) "due to problems with his

insurance." (340).  Such statement implies that McFall had been regularly attending

therapy up until that time.  Kelly Behavioral's records, though, do not mention any

problems with McFall's insurance, and indicate that McFall's file was closed in April, 2012

because he had not been to therapy sessions since November 2011, and had not

responded to a letter that the office had sent him. (T414).[16]  McFall also reportedly told

Ransom that he had "no" drug or alcohol history (T341), though that is contradicted by

several other entries in the record. *See, e.g.*, (T308, 407); see also, (398) ("[He]

acknowlede[d] a history of somewhat problematic use of alcohol[.]").

McFall told Ransom that he experienced irritability, mood swings, "sudden highs

and lows in energy," difficulty concentrating and racing thoughts. (T340).  Ransom

performed a mental status examination, and reported that McFall's speech and affect

seemed "moderately pressured, moderately dysphoric, irritable, labile and intense."

---

[15]McFall and his mother believe that he is "bi-polar."  However, neither Kelly Behavioral, nor any other treatment provider of record, has diagnosed McFall as having bipolar disorder. (T302-305, T311-321, T392-415).  At most, McFall's treatment records contain a notation that his mother thought that he might have the disorder. (T410) ("[H]e returned to treatment with his mother on 12-31-07 who felt he had a Bipolar Disorder.")

[16]McFall returned to Kelly behavioral for treatment in June, 2012, a month after being examined by Ransom. (T415).  After ten visits McFall stopped attending again, and on November 2, 2012, Kelly Behavioral again closed his case file. (T415).

(T341).  Additionally, Ransom indicated that McFall's attention, concentration and memory seemed "moderately impaired" "by emotional disturbance and anxiety," based on his responses to tests involving "simple calculations," "serial threes," and remembering three objects. (342).  At the conclusion of her examination, Ransom provided the following opinion:

> This individual will have moderate difficulty performing and understanding simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a simple regular schedule, learn simple new tasks.  He will have moderate to marked difficulty performing complex tasks, relate adequately with others and appropriately deal with stress due to bipolar disorder[17] currently moderate to marked, panic disorder with agoraphobia currently moderate. [sic]  The results of the evaluation are consistent with the claimant's allegations.

(T343).

Shortly after Ransom's examination, agency review psychiatrist R. Altmansberger, M.D. ("Altmansberger"), completed a Psychiatric Review Technique form (Exhibit 6F,T349-362) and a Mental Residual Functional Capacity Assessment report (Exhibit 7F, T363-366).  Altmansberger indicated that McFall had an affective disorder, "Bipolar NOS" (T352) and an anxiety-related disorder, "panic [disorder]." (T354).  Altmansberger opined that McFall would have a "moderate" degree of limitation as to activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace.

---

[17]Ransom diagnosed McFall with "bipolar disorder currently moderate to marked." (343). Because McFall incorrectly told Ransom that he had been receiving treatment for bipolar disorder for years, and because of the limited nature of Ransom's examination, it is unclear to this Court whether Ransom made an independent diagnosis of bipolar disorder, or simply relied on the history that McFall provided.  Nevertheless, the ALJ relied upon Ransom's report to find that bipolar disorder was one of McFall's severe impairments.

(T359).  Altmansberger also indicated that McFall would be "moderately limited" with regard to understanding and remembering simple instructions and detailed instructions, maintaining attention and concentration for extended periods, maintaining a regular schedule, working without supervision, working around others without being distracted by them, interacting appropriately with the public, completing a normal workday and workweek without interruptions from psychologically-based symptoms, accepting instructions and criticism from supervisors, getting along with co-workers, responding appropriately to changes in the workplace, and setting goals. (T359, 363-364).

Nevertheless, Altmansberger concluded that McFall is capable of working.  In that regard, Almansberger noted the evidence of McFall's fairly extensive activities of daily living, and the fact that McFall's statement to Ransom about his activities of daily living was inconsistent with such evidence. (T365).  Altmansberger also observed that McFall's statement to Ransom about his history of alcohol abuse was inconsistent with other medical evidence. (T365).  Further, Altmansberger observed:

> When claimant goes to treatment he improves.  There are limitations to attention/concentration, and recent remote memory; but he is [oriented]x3, with clear sensorium, having coherent and goal directed thought processes which are absent hallucinations/delusions/paranoia.  Speech is fluent and intelligible.  Expressive/receptive language skills are adequate without difficulty; but voice is moderately pressured/dysphoric, irritable, labile and intense.  Motor behavior hyperactive and restless.  He is however, cooperative and socially appropriate. *Although in need of treatment, and help managing money due to poor spending habits, the claimant remains capable of simple work which does not require frequent contact with others.*

(T365) (emphasis added).

In May 2013, McFall's father, mother and sister executed affidavits (T234-243), in

which they emphasize that McFall is subject to anger and mood swings, does not like being around people, does not like taking orders, and has trouble completing tasks. However, the affidavits also emphasize that McFall is dishonest and feigns illness at times. (*See, e.g.*, (T234) ("He has made it look like he was having a heart attack.  . . .Stephen will lie to every one in his life.  He has stolen money from me many times. . . . He will tell stories that are just not true to employers why he can't work, or just now show up and say he worked, or say he is sick[.]  . . .  He has also made up stories on [sic] his health that was not true."); (T238-239) ("He says he has a migraine headache and won't do anything. . . .  He would make excuses not to work.  He would say he was at work when he wasn't."); (T242-243) ("Stephen has always had trouble doing much of anything, always has illness not feeling well to get out of doing much.  . . .  He does not like to work under anyone.").

On July 26, 2013, at the hearing in this matter, McFall testified that he is unable to work essentially due to "depression," "nervousness around people," and an explosive temper: "I get to the point where my temper will get up if things are just done wrong.  I explode, which has made me lose a lot of jobs, because of me exploding at jobs." (T37). McFall stated that he eschews contact with family members, cries often and "sleep[s] most of the day away." (T45).

The ALJ received testimony from a vocational expert ("VE"), who, based on McFall's testimony, identified his past relevant jobs as "landscape laborer," "building maintenance worker" and "tire deliverer." (T52).  The ALJ posed four hypothetical questions to the VE. (T52-55).  In particular, the ALJ asked the VE to assume someone of McFall's age, experience and education, with no exertional limitations, "who is capable

of simple work, which does not require frequent contact with others," meaning "only occasional interaction with coworkers and supervisors[.]" (T53).  The ALJ then asked the VE whether such a person could perform McFall's past relevant work, and the VE answered that such a person could perform the "landscape laborer" job, but not the "building maintenance worker" and "tire deliverer" jobs, because they required contact with other people. (T53).  The VE, though, identified other jobs that such a person could perform. (T53-54).  Specifically, the VE indicated that such a person could perform the jobs of industrial cleaner, laundry worker and kitchen helper. (T53-54).  The ALJ asked the VE whether the hypothetical person could perform those same jobs if he additionally needed a low-stress job involving only occasional decision making, and the VE answered in the affirmative. (T54).

On September 26, 2013, the ALJ issued a Decision and Order (T12-23), denying McFall's applications for SSDI and SSI benefits.  In pertinent part, the ALJ applied the required five-step sequential analysis, *see*, 20 C.F.R. §§ 404.1520(a)(4)(i)-(v) (SSDI) & 416.920(a)(4)(i)-(v) (SSI), and found that McFall had the following residual functional capacity: "[T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: simple work, which does not require frequent contact with others, defined as occasional interaction with coworkers and supervisors; and no interaction with the public." (T16).  This RFC determination essentially mirrors Altmansberger's opinion, and during the ALJ's discussion of the "Paragraph B" factors at step three of the sequential analysis she explained that she was essentially adopting the limitations in Altmansberger's report and incorporating them into her RFC determination. (T15-16) ("I concur with the opinion of

14

[Altmansberger], who opined on May 18, 2012 that the claimant has moderate limitations

in his activities of daily living.  . . .  [Altmansberger also found ] that the claimant has

moderate limitations in [social functioning].  . . .  Based on this evidence, I reduced the

claimant's residual functional capacity to no interaction with the public and only

occasional superficial interaction with co-workers and supervisors.  . . .  I [also] concur

with the the opinion of [Altmansberger] . . . that the claimant has moderate limitations

[with regard to concentration, persistene or pace].  . . .  Based on the evidence, I reduced

the claimant's residual functional capacity to simple work.").  The ALJ also discussed the

other medical evidence of record, and found that overall, it was not consistent with the

severity of McFall's complaints.  Consequently, the ALJ found that McFall was "not

entirely credible" (T17), since his description of his activities of daily living was not

consistent with the medical evidence.

        With regard to the medical opinion evidence, the ALJ generally seems to have

accepted the opinions expressed, though she did "not assign significant weight" to two

aspects of Ransom's opinion: her opinion that McFall would have "moderate difficulty"

"maintain[ing] a simple regular schedule" and her opinion that he would have "moderate

to marked difficulty" performing complex tasks.  The ALJ stated that she did not give

significant weight to those opinions because they were "inconsistent with the relatively

unremarkable mental status examination" that Ransom performed. (T20)  In that regard,

the ALJ was alluding to an earlier section of her Decision and Order, where she

summarized Ransom's mental status exam as follows:

> The consultative examiner reported that the claimant's thought processes
> were coherent and goal-directed. His affect was moderately dysphoric,
> irritable, labile, intense and pressured.  However, he was oriented to all

spheres.  His attention and recent memory were moderately impaired.  His
insight and judgment were assessed as adequate.

(T16).   Such summary of Ransom's mental-status-examination results essentially tracks,

but does not quote outright, Altmansberger's summary of Ransom's findings. (T365).

Again, the ALJ's found that McFall had no exertional limitations and only the

following non-exertional limitations: Limited to "simple work, which does not require

frequent contact with others, defined as occasional interaction with coworkers and

supervisors; and no interaction with the public." (T16).  Based on that finding, the ALJ

concluded, at step four of the five-step sequential analysis, that McFall was capable of

performing his past relevant work as a landscape laborer, and was therefore not

disabled. (T21-23).  Alternatively, the ALJ found, at step five of the sequential analysis,

that even if McFall was not able to perform his past relevant work, he was capable of

performing other jobs that the VE identified, namely, industrial cleaner, laundry worker

and kitchen helper. (T22-23).

Plaintiff appealed, but the Appeals Council declined to review the ALJ's

determination.  (T1-5).

On March 31, 2015, McFall commenced this action.  McFall now maintains that

the Commissioner's decision must be reversed for the following reasons: 1) the ALJ did

not adequately discuss the opinions of Arnold, Miles, Hasselberg or Dinan, or explain the

amount of weight that he gave to those opinions; 2) the ALJ did not adequately explain

the weight that he gave to Ransom's opinion, and impermissibly substituted her own

medical judgment for Ransom's by characterizing Ransom's examination results as

"relatively unremarkable;" 3) the ALJ did not adequately explain the weight she gave to

Altmansberger's opinion; 4) the ALJ impermissibly rejected McFall's lower GAF scores while accepting the higher scores; 5) the ALJ failed to adequately explain why she did not find that the affidavits from McFall's parents and sister supported his claim of disability; 6) the ALJ failed to appreciate that McFall's symptoms wax and wane, and therefore failed to consider that McFall's relatively normal mental status examinations may have been performed during times when his symptoms were less severe; 7) the ALJ incorrectly indicated that the objective medical evidence failed to support the severity of McFall's complaints, and failed to recognize that objective findings are not required; 8) the ALJ impermissibly considered McFall's non-compliance with treatment as evidence of a lack of credibility, without first considering whether such non-compliance was the result of his personality disorder;  9) the ALJ failed to adequately explain why she found McFall's testimony about his activities of daily living "not entirely credible, when such testimony was supported by the opinions of Arnold and Ransom"; 10) when formulating hypothetical questions for the VE, the ALJ erroneously used the term "capable of simple work," which failed to include McFall's alleged low tolerance for frustration, sensitivity to criticism, social discomfort, tendency to experience emotional overload, repressed hostility, resentment toward authority, argumentative nature, difficulty dealing with stress, difficulty dealing with others, difficulty maintaining concentration, difficulty learning new tasks and difficulty maintaining a schedule; 11) the ALJ erred by finding that McFall was capable of his past work, since such work did not amount to substantial gainful activity.

To summarize these objections, McFall does not object to the ALJ's findings at the first three steps of the sequential analysis.  For instance, McFall does not object to the ALJ's finding at step two, that his "severe" impairments are all non-exertional in nature.

Instead, McFall objects primarily to the ALJ's RFC determination, which affected her findings at steps four and five.  Alternatively, McFall maintains that the findings at steps four and five are erroneous because the ALJ failed to explicitly describe all of his non-exertional impairments to the VE.  And finally, McFall contends that the step-four determination was erroneous in any event, since he has no past relevant work that amounted to substantial gainful activity.

The Commissioner opposes McFall's motion, and has cross-moved for judgment on the pleadings.

DISCUSSION

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Walker v. Bowen*, 660 F.Supp. 360, 362 (S.D.N.Y. 1987) ("The Secretary's findings of fact are binding on this Court so long as the claimant receives a fair hearing, no error of law is committed, and the findings are supported by 'substantial evidence' in the administrative record.") (Weinfeld, J.).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaal v. Apfel*, 134 F.3d at 501.

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12

18

months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

### *The ALJ's Error at Step Four of the Sequential Analysis*

In McFall's reply memorandum of law, he argues that the ALJ erred in finding that he was capable of performing his past relevant work as a "landscape laborer," and was therefore not disabled. (T21).  Specifically, McFall testified that he worked as a landscape laborer for three different employers: Soldiers and Sailors Hospital in 2000, Finger Lakes Premier Properties in 2002, and Keuka Housing Council in 2003. (T33-34, 160-161).  McFall contends that the ALJ's finding, that he could still perform such past work, is inconsistent with her other finding that none of his work since January 1, 1999 amounts to substantial gainful employment. (T14).  The Court agrees with Plaintiff, that since the ALJ found that his work as a landscape laborer was not substantial gainful activity, it does not qualify as "past relevant work" for purposes of a finding of non-disability at step four of the five-step sequential analysis. *See*, 20 C.F.R. § 404.1565(a) ("We consider that your work experience applies when it was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity.").  Consequently, the ALJ's determination at step four was erroneous.

However, such fact does not by itself require reversal, for two reasons.  First, the Court generally does not consider arguments that are raised for the first time in a reply brief. *See, e.g., Bowen v. Colvin*, No. 2:14-CV-116, 2015 WL 5918386 at *5 (D. Vt. Oct. 9, 2015)  ("Generally, arguments like this which are raised for the first time in a reply brief are deemed waived.") (citation omitted).  Second, and more importantly, the ALJ also made an alternative finding of disability at step five of the sequential analysis.  Accordingly, this aspect of Plaintiff's application is denied.

_The ALJ's Hypothetical Questions to the VE_

Plaintiff next contends that when posing hypothetical questions to the VE, the ALJ erred by using the term "simple work" or "simple unskilled work" as shorthand for his various non-exertional limitations.  Plaintiff maintains that since the VE did not have a clear understanding of his actual non-exertional impairments, the VE's testimony concerning his ability to perform other jobs, as well as the ALJ's finding at step five of the sequential analysis, are not supported by substantial evidence. _See, e.g._, Plaintiff's Memo of Law at p. 33 ("The ALJ's RFC and thus, her hypothetical, was based on legal error and failed to incorporate the full extent of the claimant's limitations, _i.e._, the inability to work with others, appropriately accept criticism and handle ordinary job stress.").  In that regard, Plaintiff cites, _inter alia, McIntyre v. Colvin_, 758 F.3d 146, 152 (2d Cir. 2014) ("_McIntyre_"), for the proposition that "an ALJ's hypothetical should explicitly incorporate any limitations in concentration, persistence and pace."[18]  The Court agrees that _McIntyre_ applies, but does not agree that _McIntyre_ requires a reversal of the Commissioner's ruling.

In _McIntyre_, the claimant alleged that the ALJ failed to "explicitly" include all of her non-exertional impairments in both his RFC determination and his hypothetical questions to the VE. _Id._, 758 F.3d at 148.  In particular, while the ALJ found that the claimant had "moderate difficulties in maintaining social functioning and maintaining concentration, persistence, and pace," he did not explicitly include those limitations in the RFC determination.  Further, when posing hypothetical questions to the VE, the ALJ

---

[18]Pl. Memo of Law at p. 32.

attempted to summarize the claimant's limitations (with regard to social functioning, concentration, persistence and pace) by referring to a hypothetical claimant who was capable only of "simple, routine, low stress tasks." *Id.*, 758 F.3d at 151.   The Second Circuit agreed that the ALJ's RFC determination and hypothetical questions were "incomplete," because they failed to explicitly mention the claimant's non-exertional limitations. Id., 758 F.3d at 148.

Nevertheless, the Second Circuit affirmed the Commissioner's denial of benefits, since the ALJ's hypothetical question to the VE "implicitly (and sufficiently) accounted for [the claimant's] particular non-exertional limitations." Id., 758 F.3d at 148.  In that regard, the Circuit Court in *McIntyre* found that the ALJ's error was harmless, stating:

> We hold, however, that an ALJ's failure to incorporate non-exertional limitations in a hypothetical (that is otherwise supported by evidence in the record) is harmless error if (1) medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, and the challenged hypothetical is limited to include only unskilled work; or (2) the hypothetical otherwise implicitly accounted for a claimant's limitations in concentration, persistence, and pace.
>
> Here, substantial evidence in the record demonstrates that McIntyre can engage in simple, routine, low stress tasks, notwithstanding her physical limitations and her limitations in concentration, persistence, and pace. By explicitly limiting the hypothetical to such tasks (after fully explaining McIntyre's physical restrictions), the ALJ sufficiently accounted for the combined effect of [McIntyre's] impairments. The ALJ's error therefore was harmless.

*Id.*, 758 F.3d at 152 (citations and internal quotation marks omitted).

In the instant case, this Court similarly finds that to the extent that the ALJ's RFC determination and hypothetical questions to the VE may have been erroneous because

they failed to explicitly list McFall's non-exertional impairments, such error was harmless. As already mentioned, the ALJ's RFC determination attempted to account for McFall's non-exertional impairments by limiting him to "simple work, which does not require frequent contact with others, defined as occasional interaction with coworkers and supervisors[,] and no interaction with the public." (T16).  Moreover, the hypothetical question posed to the VE was limited to unskilled work.[19]  Accordingly, the instant case satisfies the first prong of the *McIntyre* test set forth above, and the Court need not analyze the second, alternative, prong.  This aspect of Plaintiff's motion is therefore denied.

### *The ALJ's Evaluation of the Medical Opinion Evidence*

As set forth in more detail above, Plaintiff generally maintains that "[i]n reaching the RFC, the ALJ did not consider all of the relevant evidence," and that her "reasons for rejecting the opinion evidence [are] flawed."[20]  In that regard, Plaintiff contends that the ALJ failed to follow SSR 85-16.  The Court agrees that the ALJ's discussion of the medical opinion evidence is flawed, and that a remand is therefore required.

In cases such as this where an ALJ does not give controlling weight to the opinion of a treating physician, the ALJ must explain the weight that he gives to the medical evidence. *See, e.g.*, 20 C.F.R. § 404.1527(e)(2)(ii) ("Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or

---

[19]The VE's answer indicates that he correctly understood the ALJ's reference to "simple work" to mean "unskilled work with simple tasks." (T53).

[20]Pl. Memo of Law at p. 16.

other program physician, psychologist, or other medical specialist, as the administrative

law judge must do for any opinions from treating sources, nontreating sources, and other

nonexamining sources who do not work for us.").

As already mentioned, it appears that the ALJ essentially adopted

Altmansberger's opinion in making her RFC finding.  However, the ALJ's decision

appears to be internally inconsistent in its treatment of Altmansberger's opinion.  Early in

the decision, the ALJ indicates that she "concurs" with Altmansberger's statements, and

relies upon them to find that McFall is limited to "simple work" involving "no interaction

with the public and only occasional superficial interaction with co-workers and

supervisors." (T15-16).  Later in the decision, though, the ALJ seems to indicate that she

assigned only "some weight" to Altmansberger's opinion insofar as it pertained to

McFall's "exertional" limitations, and otherwise gave little or no weight to the report.

(T20-21).  In other words, the ALJ initially seems to accept Altmansberger's opinion that

McFall can still work despite having a variety of moderate-to-marked non-exertional

limitations, but later she seems to reject Altmansberger's opinion that McFall has such

non-exertional limitations. (Compare, T15-16 with T20-21).  The ALJ should have

explained this apparent inconsistency.

Moreover, although the ALJ explained the weight that she gave to certain aspects

of Ransom's opinion, she did not explain the weight that she gave to the majority of that

report, nor did she explain the basis for her statement that Ransom's mental status exam

results were "relatively unremarkable," given that there were several abnormal findings.

(T20, 341-342) (Appearance, speech, affect, attention, concentration, memory).

Further, while it *appears* that the ALJ may have generally accepted the opinions of

Arnold, Dinan, Miles and Hasselberg, she did not offer sufficient explanation on that point.  The ALJ should have explained how she viewed such evidence, and the amount of weight that she gave to it in making her RFC finding.  In that regard, to the extent that the ALJ accepted the evidence from Arnold, Dinan, Miles and Hasselberg, indicating that McFall has particular personality disorders that manifest themselves periodically (*e.g.*, impaired ability to form and direct responses and tendency to become emotionally overloaded, T402), she should have explained why those effects would not prevent him from working.

Similarly, with regard to the affidavits submitted by McFall's parents and sister, the ALJ should have explained whether their description of McFall's behavior is consistent with the medical evidence, and if so, why McFall is nevertheless able to work.

With regard to GAF scores, the Court notes, initially, that the ALJ seems to have paid an inordinate amount of attention to such scores, in relation to the other medical evidence. *See, Ely v. Colvin*, No. 14-CV-6641P, 2016 WL 315980, at *4 (W.D.N.Y. Jan. 27, 2016) ("GAF scores may be relevant to an ALJ's severity and RFC determinations, although they are intended to be used to make treatment decisions and not disability determinations.") (citation and internal quotations omitted).  That is, the ALJ expressly indicated the amount of weight that she gave to almost every GAF score, but did not explain the weight that she gave to much of the other evidence.  The ALJ also rejected certain GAF scores solely because she perceived them as being inconsistent with the results of contemporaneous mental status examinations (*see, e.g.*, T17, last full paragraph), without explaining her premise that a low GAF score is necessarily incompatible with a normal mental status examination.

### *The ALJ's Evaluation of McFall's Credibility*

 McFall next contends that the ALJ erred in evaluating his credibility.

Administrative Law Judges are required to evaluate a claimant's credibility  concerning

pain according to the factors set forth in the Commissioner's regulations, which state, in

relevant part:

> In determining whether you are disabled, we consider all your symptoms,
> including pain, and the extent to which your symptoms can reasonably be
> accepted as consistent with the objective medical evidence and other
> evidence. By objective medical evidence, we mean medical signs and
> laboratory findings as defined in § 404.1528 (b) and (c). By other evidence,
> we mean the kinds of evidence described in §§ 404.1512(b)(2) through (8)
> and 404.1513(b)(1), (4), and (5), and (d). These include statements or
> reports from you, your treating or nontreating source, and others about your
> medical history, diagnosis, prescribed treatment, daily activities, efforts to
> work, and any other evidence showing how your impairment(s) and any
> related symptoms affect your ability to work. We will consider all of your
> statements about your symptoms, such as pain, and any description you,
> your treating source or nontreating source, or other persons may provide
> about how the symptoms affect your activities of daily living and your ability
> to work.
>
> ***
>
> In evaluating the intensity and persistence of your symptoms, including
> pain, we will consider all of the available evidence, including your medical
> history, the medical signs and laboratory findings and statements about
> how your symptoms affect you. (Section 404.1527 explains how we
> consider opinions of your treating source and other medical opinions on the
> existence and severity of your symptoms, such as pain.) We will then
> determine the extent to which your alleged functional limitations and
> restrictions due to pain or other symptoms can reasonably be accepted as
> consistent with the medical signs and laboratory findings and other
> evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in

relevant part:

Factors relevant to your symptoms, such as pain, which we will consider
include:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other
symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you
take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief
of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other
symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every
hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due
to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).  However, while an ALJ is

required to consider these factors, he is not required to explicitly discuss each one. *See,*

*Pellam v. Astrue*, 508 Fed.Appx. 87, 91, 2013 WL 309998 at *3 (2d Cir. Jan. 28, 2013)

("The ALJ did not apply an incorrect legal standard when judging the credibility of

Pellam's testimony. Although the ALJ did not explicitly discuss all of the relevant factors,

Pellam has failed to point to any authority requiring him to do so. In any event, the ALJ

cited the applicable regulation, 20 C.F.R. § 404.1529, explicitly mentioned some of the

regulatory factors (such as Pellam's limited use of pain medication), and stated that he

considered all of the evidence required by § 404.1529.").  If it appears that the ALJ

considered the proper factors, his credibility determination will be upheld if it is supported

by substantial evidence in the record. *Id*.

Where a claimant has not been compliant with treatment, an ALJ should not draw

any negative inferences about his credibility without first exploring the reasons for the

non-compliance.  On this point the Commissioner has stated:

[S]tatements may be less credible if the level or frequency of treatment is

26

inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility.

Titles II & Xvi: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, SSR 96-7p (S.S.A. July 2, 1996).

Here, the ALJ specifically stated that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and 416.929 and SSRs 96-4p and 96-7p." (T16).

Nevertheless, McFall contends that the ALJ erroneously found that the medical evidence was inconsistent with the severity of his complaints.  Additionally, McFall maintains that the ALJ failed to properly explain whether or not she credited his testimony about his activities of daily living, and impermissibly drew negative inferences against him based on his failure to continue therapy, without first considering whether his non-compliance was caused by his personality disorder.  The Court has already found that the ALJ's discussion of the medical evidence was deficient, and also agrees with McFall that it is presently unclear whether the ALJ credited his testimony about his

activities of daily living.  Further, with regard to SSR 96-7p, the ALJ did not clearly explain why she found that McFall's non-compliance with treatment was due to factors other than his psychological problems.  On remand, after clarifying her analysis of the medical evidence, the ALJ should address these points.

CONCLUSION

Defendant's cross-motion [#12] for judgment on the pleadings is denied, and Plaintiff's motion for judgment on the pleadings [#10] is granted, though his request to have the matter remanded solely for calculation of benefits is denied.[21]  The matter is reversed and remanded to the Commissioner for further administrative proceedings.  The Clerk of the Court is directed to enter judgment in Plaintiff's favor and to close this action.

So Ordered.

Dated: Rochester, New York
     April 26, 2016           ENTER:


                         /s/ Charles J. Siragusa
                         CHARLES J. SIRAGUSA
                         United States District Judge

---

[21]Although Plaintiff's motion includes a boilerplate demand to have the case remanded solely for calculation of benefits,  he has not shown that such relief is appropriate in this case.